❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched* )<br>*or identify the person by name and address)* )<br>Facebook account associated with username "Ronnie Trnd )<br>and Facebook URL https://www.facebook.com/profile.php? )<br>id=100072819650726  (Target Account) )<br>) | Case No. 24-902M(NJ)<br><br>Matter No. 2023R00109 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.


I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.


**YOU ARE COMMANDED** to execute this warrant on or before 9/25/2024 _____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: 9/11/2024 @ 5:12p.m. _____

City and state:   Milwaukee, WI _____

*Judge's signature*

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

**Matter No. 2023R109**

This warrant applies to information associated with Facebook account associated with username **"Ronnie Trnd** and Facebook URL https://www.facebook.com/profile.php?id=100072819650726 (**Target Account)** that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

1

**ATTACHMENT B**
**Particular Things to be Seized**
**Matter No. 2023R109**

I.      **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from May 1, 2023, to present;

(c)     All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them from May 1, 2023, to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which

2

the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user from May 1, 2023, to present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(f)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from May1, 2023, to present;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

3

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(r)     Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations possess with the intent to distribute, and conspiracy to possess with the intent to distribute and distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) and 846; possession of a machinegun, in violation of Title 18, United States Code, Section 922(o); and possession of a firearm in furtherance of drug trafficking, in violation of Title 18, United States Code Section 924(c), involving Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH (XX/XX/1990); Karon BROWN (DOB: XX/XX/2002), Kevin DEAN (DOB: XX/XX/2005), and other identified and unidentified individuals since May 1, 2023, to present, including, for each user ID identified on Attachment A, information pertaining to the following matters:§

4

(a) The sale of illegal drugs, any preparatory steps taken in furtherance of the criminal scheme, and communications between Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH (XX/XX/1990); Karon BROWN (DOB: XX/XX/2002), Kevin DEAN (DOB: XX/XX/2005), and others related to the relevant offense conduct of the sale of illegal drugs, possession of firearms in furtherance of drug trafficking, or the possession of a machinegun.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; and

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

5

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Facebook account associated with username "Ronnie Trnd<br>and Facebook URL https://www.facebook.com/profile.php?<br>id=100072819650726  (Target Account) | )<br>)<br>)<br>)<br>)<br>) |

Case No.  24-902M(NJ)

Matter No. 2023R00109

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846<br>18 U.S.C. §§ 922(o) & 924(c) | Conspiracy to possess with the intent to distribute and distribute controlled<br>substances; Possession of a machinegun; and Possession of a firearm in<br>furtherance of drug trafficking. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Mitchell G. Ward, DCI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date:  9/11/2024
_____
*Judge's signature*

City and state:  Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**MATTER NUMBER 2023R00109**

I, Mitchell G. Ward, a Special Agent with the Wisconsin Department of Justice-Division of Criminal Investigation (DOJ-DCI) being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for search warrant for information associated with the following Facebook user "**Ronnie        Trnd**" [ https://www.facebook.com/profile.php?id=100072819650726] (**Target Account**) that is stored at premises owned, maintained, controlled, or operated by Meta Platform Inc., ("Meta") a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A and B.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta Platform Inc to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation, (DOJ-DCI) and have been a sworn officer in the State of Wisconsin for over 30 years.  I am currently assigned to DOJ-DCI's Milwaukee Field Office, Narcotics Bureau.  I am also a federally deputized task force officer for the United States Postal Inspection Service ("USPIS").  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

1

3.     The USPIS is the primary investigative arm of the United States Postal Service ("USPS") and is charged under Title 18, United States Code, 3061 with the enforcement of laws governing the use and movement of the United States Mail, including the misuse and fraudulent schemes involving the mail, crimes relating to mail fraud, narcotics trafficking and identity theft involving the United States Mail.

4.     I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses.  I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps.

5.     My training and experience include the following:

a.     Through informant interviews and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations finance, source, purchase, transport, and distribute controlled substances in Wisconsin, throughout the United States, and internationally.

b.     I have used my training and experience to locate, identify, and seize multiple types of narcotics, drugs, drug proceeds, and drug contraband.

c.     I have also relied upon informants to obtain controlled substances from drug traffickers and have made undercover purchases of controlled substances.

d.     I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

e.     I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug traffickers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

2

f.     I am familiar with the language used over the telephone and other electronic communications to discuss drug trafficking and know that the language is often limited, guarded, and coded. I know the various code names used to describe controlled substances. I also know that drug traffickers often use electronic devices (such as computers and cellular phones), electronic communication services (such as e-mail and messaging services), and social media, like Facebook to facilitate these crimes.

g.     I know drug traffickers often register phones, mailboxes, bank accounts, electronic communication services, and other instrumentalities of drug trafficking in the names of others, also known as nominees, to distance themselves from instrumentalities used to facilitate drug trafficking.

h.     I know that drug traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking operations.

i.     I know that drug traffickers often keep documents and records about the transportation, sourcing, ordering, sale, and distribution of controlled substances.

j.     I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase or title these assets in order to avoid scrutiny from law enforcement officials. I know that drug traffickers often secure drug proceeds at locations within their dominion and control, such as their residences, businesses, and storage facilities, and in safes or other secure containers.

k.     I know that drug traffickers often attempt to protect and conceal drug proceeds through money laundering, including but not limited to domestic and international banks, securities brokers, service professionals such as attorneys and accountants, casinos, real estate, shell corporations, business fronts, and otherwise legitimate businesses which generate large quantities of currency. I know it is common for drug traffickers to obtain, secrete, transfer, conceal, or spend drug proceeds, such as currency, financial instruments, precious metals, gemstones, jewelry, books, real estate, and vehicles. I know it is common for drug traffickers to maintain documents and records of these drug proceeds, such as bank records, passbooks, money drafts, transaction records, letters of credit, money orders, bank drafts, titles, ownership documents, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other documents relating to the purchase of financial instruments or the transfer of funds. I know drug traffickers often purchase or title assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are titled or purchases by nominees, the drug traffickers actually own, use, and exercise dominion and control over these assets. The aforementioned books, records,

3

receipts, notes, ledgers, and other documents are often maintained where the traffickers have ready access. These may be stored in hard copy or soft copy on paper, computers, cellular devices, and other electronic media or electronic storage devices.

l.   I know drug traffickers maintain large amounts of currency, including in readily accessible financial accounts, to finance their ongoing drug business. I know that those involved in drug trafficking or money laundering keep records of their transactions. Because drug trafficking generates large sums of cash, drug traffickers often keep detailed records about the distribution of narcotics and the laundering of proceeds. I also know that drug trafficking and money laundering activities require the cooperation, association, and communication between and among a number of people. As a result, people who traffic in narcotics or launder money for such organizations possess documents that identify other members of their organization, such as telephone books, address books, handwritten notations, telephone bills, and documents containing lists of names and addresses of criminal associates. Such records also provide information about the identities of coconspirators who launder money and traffic drugs. I also know that drug traffickers commonly maintain addresses or telephone numbers which reflect names, addresses, or telephone numbers of their drug trafficking and money laundering associates in hard copy and soft copy on papers, books, computers, cellular devices, and other electronic media or electronic storage devices.

m.   I know drug traffickers often use electronic devices, such as telephones, cellular devices, computers, and currency counting machines to generate, transfer, count, record, or store the information described above and conduct drug trafficking and money laundering. I am familiar with computers, cellular devices, pagers, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and fellow traffickers. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, and their drug proceeds. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and (2) the objects may have been used to collect and store information about crimes. I know the following information can be retrieved to show evidence of use of a computer or smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and

4

network devices and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

n.  I have participated in numerous drug trafficking investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. This has led to evidence of the crimes under investigation and corroborated information already known or suspected by law enforcement. I have regularly used electronic evidence to find proof relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of suspects and conspirators.

o.  I have also participated in the execution of numerous premises search warrants and arrests, where controlled substances, firearms, drug paraphernalia, drug proceeds, electronic devices, and records relating drug trafficking and drug proceeds were seized. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

p.  I have been assigned to court-authorized wiretaps and have been trained to operate the equipment used to conduct such operations.

6.  I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. Through my experience and training, I am aware that electronic devices, such as cellphones, can be used to store and save audio, video, and text files that can link to a variety of criminal activity. I am also aware that smart cellphones are capable of capturing location history for the device. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have

5

regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

7.    This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.  Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.   Because this affidavit is submitted for the limited purpose of securing authorization for search warrants, I have not included each fact known to me concerning this investigation.   I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrants.

8.    I am currently participating in an investigation of cocaine, fentanyl and cocaine trafficking, possession of machinegun, and possession of a firearm in furtherance of drug trafficking involving Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH (XX/XX/1990); Karon BROWN (DOB: XX/XX/2002), Kevin DEAN (DOB: XX/XX/2005) and other known and unknown individuals.  I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers; (c) information obtained from numerous witnesses, including confidential sources; (d) controlled buys; (e) documentary evidence; (f) physical and electronic surveillance; and (g) physical seizures.

9.    This affidavit is submitted in support of an application for a search warrant for

6

Karon BROWN's Facebook Account, for evidence of BROWN's and others' involvement in the above-described offenses between May 1, 2023, to present. More specifically, I seek authorization to search Facebook's information associated with Karon BROWN, who is the user associated with the Facebook accounts with the following usernames and ID numbers (Figure 1):

| FACEBOOK NAME | FACEBOOK URL |
|---|---|
| Ronnie Trnd | https://www.facebook.com/profile.php?id=100072819650726 |



(Figure 1)

**PROBABLE CAUSE**

10.     Since February 2023, the Drug Enforcement Administration (DEA), the United States Postal Inspection Service (USPIS), and the Wisconsin Department of Justice have been conducting an investigation involving Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH (XX/XX/1990); Karon BROWN (DOB: XX/XX/2002), Kevin DEAN (DOB: XX/XX/2005) and other known and unknown individuals, who are believed to be members of a Milwaukee-area based DTO engaged in the distribution of cocaine/fentanyl and believed to be sourced from California.

**A.     Background**

11.     On February 23, 2023, USPIS Inspector Kim Lincoln was alerted to a parcel bearing USPS Priority Mail Express tracking number EI 649 372 511 US (wooden crate) being shipped to Jordan Woodman at the address 1940 North 15th Street, Milwaukee, WI, 53205.  The parcel was shipped from California with a return name and address of the "Earthquake Store" located in Burbank California.  The address of 1940 North 15th Street does not exist, and the parcel was not delivered.  On this same date two individuals showed up at the Hilltop Post Office in Milwaukee, Wisconsin attempting to take custody of the package addressed to Jordan Woodman. The first individual claimed to be James Woodman and further stated to the employee at the post office that he was the nephew of Jordan Woodman.  The second individual stated they were Jordan Woodman.  However, the post office would not relinquish custody of the package because the address on the ID provided by Jordan Woodman was 1942 North 15th Street which did not match the address the parcel was addressed to.  Inspector Lincoln ultimately discovered that the parcel contained just over two kilograms of fentanyl.

8

12.     Case agents then examined USPS databases and discovered that this parcel and others were being tracked by IP addresses in both California and Mexico. Case agents identified other packages identical to the initial parcel (EI 649 372 511) containing fentanyl all addressed to Jordan Woodman, two in Milwaukee, one in the Saint Louis, Missouri area, and one in northern Illinois. On February 27, 2023, case agents were conducting follow-up regarding the parcel (EI 649 372 511) at the Hilltop Post Office when an individual came to the counter attempting to claim the package. This person identified himself to Postal Inspectors as Jordan Woodman. This subject presented an ID Card Receipt from the Wisconsin Department of Transportation issued to Jordan Woodman at 1942 N 15th Street, Milwaukee, WI, 53205. Once the subject realized that they were speaking with law enforcement officers and not Post-Office employees, he and a second subject with him immediately left the post office. Case agents later determined that the identification Woodman presented was false and positively identified him as Patrick VAUGHN. Case agents also identified the subject claiming to be "James" (nephew of Jordan Woodman) as James E. JAMES III. Both JAMES and VAUGHN are Milwaukee residents.

13.     On June 14, 2023, SA Mitchell Ward along with USPIS Inspector Kim Lincoln interviewed Patrick VAUGHN regarding this investigation. VAUGHN admitted to attempting to retrieve the parcel (EI 649 372 511 US) from the Hilltop Post Office for his drug supplier nicknamed "400" on February 23, 2023. VAUGHN said he buys small amounts of cocaine and "weed" (i.e., marijuana) from "400". VAUGHN stated he did not know "400's" real name, but provided his phone number, i.e., 414-627-2727, which VAUGHN used to contact "400" to arrange the purchase of cocaine. VAUGHN stated that "400" uses various cars to deliver cocaine. VAUGHN described "400" as a black male, aged between mid-thirties and early-forties, who had a short or bald hairstyle.

14.     Case agents then obtained a court order authorizing them to obtain call information related to telephone 414-627-2727 and reviewed historical call detail records of telephone 414-627-2727. Case agents recognized VAUGHN's number as one of the top callers to telephone 414-627-2727. From April 14, 2023, to June 14, 2023 VAUGHN was using telephone number 414-998-7482 and communicated 127 times with telephone 414-627-2727. Case agents know that VAUGHN's phone number is 414-998-7482 because VAUGHN provided case agents consent to review the contents of his phone when he was interviewed on June 14, 2023.

15.     Additionally, case agents identified another top caller as Bradley DIDENKO of 3142 South Pine Street (lower), Milwaukee, Wisconsin. DIDENKO was using telephone number 414-881-9687 from the time period of April 19, 2023, to June 16, 2023, and call records reflect 365 call between DIDENKO and telephone 414-627-2727. A search of law enforcement data bases showed that Jordan MAYRAND also resides at 3142 South Pine Street (lower), Milwaukee, Wisconsin 53207. On June 9, 2023, the West Allis Police Department arrested MAYRAND for several felony drug offences (Eastern District of Wisconsin case no.: 23-cr-219).

16.     On August 1, 2023, a State of Wisconsin search warrant was executed at DIDENKO's residence, 3142 S. Pine Ave, Milwaukee, WI. Due to the nature of the search warrant and contact with Law Enforcement DIDENKO's probation and parole officer put a probation hold on DIDENKO and DIDENKO was taken into custody.

17.     On August 1, 2023, case agents interviewed Bradley DIDENKO. DIDENKO stated that he regularly purchases small amounts of fentanyl from an unknown black male. DIDENKO stated that he calls telephone 414-627-2727 to arrange the purchase of fentanyl. DIDENKO stated the same person does not always deliver the fentanyl to him after he places an order. DIDENKO stated that the "main guy" is a black male who he knows only by the nickname

of "Fast." DIDENKO stated that although he recently hasn't seen "Fast," "Fast's workers" last sold him a gram of fentanyl on July 31, 2023. DIDENKO said he typically buys between a half gram and a gram of fentanyl every other day. Case agents know that DIDENKO was using telephone number 414-881-9687 to contact telephone 414-627-2727 because he provided consent for case agents to review the contents of his cellular phone when he was interviewed on August 1, 2023.

18.     On August 16, 2023, case agents spoke with a confidential source (CS-1) regarding this investigation. CS-1 stated that an individual known as "Fast" sells fentanyl and cocaine in the greater Milwaukee area. CS-1 stated that "Fast" has been using telephone 414-627-2727 to conduct sales of fentanyl and cocaine for the past year. CS-1 stated that once the order is placed on telephone 414-627-2727, either "Fast" or one of his "crew" delivers the narcotics at various locations in the greater Milwaukee area. CS-1 stated that most narcotics transactions with "Fast" occur in public areas chosen by "Fast."

19.     CS-1's information is credible and reliable because CS-1 has given information concerning individuals involved in illegal activities. CS-1's information has been independently verified through this investigation, including through controlled drug buys, queries of law enforcement databases, and surveillance. CS-1 has made statements against his/her penal interest. CS-1 has felony convictions for Manufacture/Delivery Cocaine and Forgery. CS-1 has no arrests or convictions relating to dishonesty. CS-1 is cooperating with law enforcement for monetary compensation. Case agents are aware that CS-1 cooperated with another law enforcement agents in April 2023 and during a controlled buy CS-1 attempted to keep some of the controlled substances. Law enforcement confronted CS-1 and CS-1 admitted to conduct. In relation to the controlled buys outlined below, case agents have conducted surveillance and reviewed the

recorded drug buys. Case agent have not observed any incidents of dishonesty or concerns about CS-1 keeping any of the controlled substances during this investigation.

20. On September 20, 2023, the Honorable Stephen C. Dries, United States Magistrate Judge in the Eastern District of Wisconsin, authorized a warrant for electronic surveillance of telephone number 414-627-2727.

**B.** **Controlled Buys**

21. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as the CS-1, purchases drugs from a target at the direction of law enforcement. For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents. The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

22. Under the direction of case agents CS-1 made a total of six controlled buys by communicating with the holder of telephone 414-627-2727.

**a) October 5, 2023, Controlled Buy - Anton MATTHEWS**

23.     On October 5, 2023, CS-1 arranged to purchase 1 gram of crack cocaine and 1/2 gram of fentanyl for $130 USC by calling 414-627-2727.  Telephone 414-627-2727  was answered by an unknown male who directed CS-1 to come to 4936 North 40th Street, Milwaukee, Wisconsin to complete the transaction.  CS-1 explained to case agents that 4936 North 40th Street was a location often used by this DTO and stated they had been directed to this address on several occasions.  CS-1 stated that this was a residential address with a long wheelchair ramp coming from the front door and extending towards the street.  Approximately five minutes after CS-1 confirmed the location, CS-1 received another call from telephone 414-627-2727 and CS-1 was then instructed to meet in the area of 7th Street and Capitol in Milwaukee.  CS-1 stated they'd been to this area in the past to conduct transactions and believed there was a house in this area where they would be directed. CS-1 did not recall an exact address.

24.     Surveillance had already been established in the area of 7th Street and observed a silver Jeep Cherokee, bearing Wisconsin plates ALY-1398 (Jeep) arriving in front of 4076 North 7th Street.  According to the Wisconsin Department of Transportation, ALY-1398 is registered to Anton MATTHEWS at 4076 North 7th Street, and case agents positively identified MATTHEWS as the driver of the Jeep based on MATTHEWS driver's license photograph.  MATTHEWS was observed exiting the Jeep and walking to the front porch area of 4076 North 7th Street.  A short time later, MATTHEWS was observed walking back toward the Jeep and entering the driver's seat.  MATTHEWS was then observed pulling away from the front 4076 North 7th Street and immediately pulling over around the corner on Fiebrantz Avenue, just East of 7th Street.

25.     CS-1 received another phone call from telephone 414-627-2727 shortly after the Jeep pulled around the corner.  CS-1 was instructed to meet near the alley that runs behind the 7th Street address.  CS-1 was then observed by case agents arriving in the area and pulling directly

13

behind the Jeep on Fiebrantz Avenue. CS-1 was observed by case agents exiting the CS vehicle and entering the front passenger seat of the Jeep. CS-1 was inside the Jeep for approximately two minutes. While inside the Jeep, CS-1 obtained suspected controlled substances in exchange for $130. CS-1 then exited the Jeep and returned to Cs-1's vehicle. CS-1 was followed directly back to the predetermined meet location by case agents where CS-1 turned over two small baggies, one containing suspected crack cocaine and one containing suspected fentanyl. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results. CS-1 was later shown a driver's license photograph of Anton MATTHEWS, who CS-1 positively identified as the individual who sold CS-1 the suspected crack cocaine and suspected fentanyl inside the Jeep. CS-1 stated that MATTHEWS was not the individual CS-1 knew as "Fast."

### b. October 12, 2023, Controlled Buy - Lorenzo GOODEN

26. On October 12, 2023, under the direction of case agents, CS-1 conducted a controlled purchase of fentanyl and crack cocaine with the DTO. CS-1 called telephone number 414-627-2727 and it was answered by an unknown male. CS-1 was instructed to come to the area of 1st Street and National in Milwaukee, Wisconsin. CS-1 was followed by case agents to the area of 1st Street and National where surveillance had already been established. CS-1 parked on the south side of East Florida Street to the east of 1st Street, Milwaukee, Wisconsin. Approximately two minutes later, case agents observed a black Nissan SUV, bearing Wisconsin plates AKF-5062 (Nissan) arrive in the area and park on the opposite side of Florida Street from CS-1's vehicle.

27. CS-1 exited his/her vehicle and entering the front passenger seat of the Nissan. The Nissan then pulled away east on Florida Street and pulled over in the area of Florida Street and Water Street. The Nissan stopped for a very brief period of time at Florida Street and Water Street

and then drove back to where CS-1's vehicle was parked. CS-1 exhibited the Nissan and got back into CS-1's vehicle. While inside the Nissan, CS-1 obtained suspected controlled substances in exchange for $130. The Nissan was under constant visual surveillance by case agents for the duration of the interaction with CS-1. CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time. Once back at the predetermined location CS-1 handed over two small baggies, one containing suspected crack cocaine and the other containing suspected fentanyl. The suspected crack cocaine and suspected fentanyl weighed approximately 1 gram each and were later subjected to field tests where they both yielded positive results.

28.     CS-1 was later shown a photograph of GOODEN, who CS-1 positively identified as the individual in the black Nissan who had sold CS-1 the suspected crack cocaine and suspected fentanyl. CS-1 stated that GOODEN was not the individual CS-1 knew as "Fast." Case agents also compared the video recording from the buy and booking photographs of GOODEN and positively identified GOODEN as the individual that sold CS-1 fentanyl and crack cocaine.

### c. October 26, 2023, Controlled Buy - Duane WILLIAMS

29.     On October 26, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of 1/2 gram of fentanyl and 1 gram of crack cocaine for $130 USC. CS-1 called telephone 414-627-2727, which was again answered by an unknown male. CS-1 was instructed to come to the area of 7th Street and Walnut in Milwaukee, Wisconsin. CS-1 was then directly followed by case agents to the area of North 7th and Walnut where surveillance had already been established. CS-1 ultimately parked the CS-1's vehicle on West Reservoir Avenue just to the west of North 7th Street. Approximately twenty minutes after CS-1 parked on West Reservoir Avenue, case agents observed a silver Honda Accord car bearing Wisconsin plates

15

ANY-6044 (Accord) arrive in the area and park near the CS vehicle. CS-1 was then observed exiting the CS-1's vehicle and walking to the Accord. CS-1 was observed leaning into the passenger window of the Accord for approximately three minutes. While leaning into the Accord, CS-1 obtained suspected controlled substances in exchange for $130. CS-1 then walked back to CS-1's vehicle and departing the area. CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time. Once back at the predetermined location CS-1 handed over approximately one gram of suspected fentanyl and one gram of suspected crack cocaine to case agents. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results.

30. Utilizing a law enforcement database case agent were able obtain and compare booking photographs and determined that Duane WILLIAMS (DOB: XX/XX1998) was the driver of the Accord. CS-1 was later shown a photograph of WILLIAMS to which CS-1 positively identified as the individual who had sold CS-1 the suspected crack cocaine and suspected fentanyl. CS-1 further stated that they believe WILLIAMS lives at 4936 North 40th Street, Milwaukee, Wisconsin, due to previous interactions with WILLIAMS at this address. CS-1 stated that during the deal with WILLIAMS, CS-1 observed a Glock with an extended magazine tucked in between the driver's seat and the center console of WILLIAMS vehicle in plain view.

31. Case agent also reviewed WILLIAMS criminal history. WILLIAMS was convicted of a felon offense of attempting to flee in Milwaukee County Case Number 2019CF1598.

32. During surveillance at 4936 North 40th Street, Milwaukee, Wisconsin, case agents also observed the Accord parked in the driveway at on multiple occasions. Additionally, case agents observed DIDENKO meet with the Accord on July 31, 2023, in the alley behind

16

DIDENKO's residence, 3142 South Pine Street (lower), Milwaukee, Wisconsin. On this occasion, case agents observed what appeared to be a hand-to-hand drug transaction between DIDENKO and the driver of the Accord.

### d. November 13, 2023 Controlled Buy - Duane WILLIAMS

33.    On November 13, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of fentanyl and crack cocaine in exchange of $130 USC. Case agents met CS-1 at a predetermined location and CS-1 called telephone number 414-627-2727, and the call went unanswered. A few moments later CS-1 received an incoming call from telephone number 414-627-2727 and the individual calling instructed CS-1 to go to the area of North 41st Street and West Hampton Avenue. CS-1 believed the person utilizing telephone number 414-627-2727 was the same individual (Duane WILLIAMS) that CS-1 had met with on October 26, 2023 based on the sound of the voice.

34.    CS-1 was followed by case agents to the 4500 block of North Sherman Boulevard. At this point, CS-1 received an incoming call from telephone number 414-627-2727 and was directed to go to the area of North 14th Street and West Capitol Drive. Prior to CS-1 arriving, case agents established surveillance in the 3900 block of North 14th Street in anticipation of the deal. Once arriving in the area case agents observed Duane WILLIAMS occupying the driver's seat of the Accord which was parked in front of 3943 North 14th Street. Case agents also observed an unknown female passenger in the Accord.

35.    Once CS-1 arrived in the area CS-1 was observed parking on the west side of the street, directly in front of the Accord. CS-1 was then observed exiting CS-1's vehicle and walking to the passenger side of the Accord where CS-1 engaged with the occupants of the Accord through the open passenger window. CS-1 completed the controlled purchase and was observed walking

17

back to CS-1's vehicle and departing the area. CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.

36.     Once back at the predetermined location CS-1 handed over approximately one gram of suspected fentanyl and one gram of suspected crack cocaine to case agents. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results.

37.     CS-1 stated that they had observed two Ziplock bags in WILLIAMS' lap, one containing what appeared to CS-1 as "at least five ounces of purple fentanyl" and the other contained what appeared to contain "three ounces of cocaine." CS-1 stated that WILLIAMS retrieved small amounts of both substances and weighed them on a small digital scale located on the arm rest of the Accord. CS-1's statements were corroborated by the Audio and Video recording device that CS-1 was equipped with during this transaction.

**e.     November 30, 2023, Controlled Buy - Duane WILLIAMS**

38.     On November 30, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of fentanyl and crack cocaine in exchange of $130 USC. Case agents met CS-1 at a predetermined location and CS-1 called telephone 414-627-2727, and the call went unanswered. A few moments later, CS-1 received an incoming call from the telephone 414-627-2727. CS-1 answered the call and was ultimately instructed to come to the area of North 40th Street and West Hampton Avenue. Case agents were already aware that Duane WILLIAMS lived at 4936 North 40th Street and surveillance units were sent to that location after the phone call between CS-1 and telephone 414-627-2727. Once surveillance units were established, a black Maserati sedan (Maserati) was observed back into the driveway of 4936 North 40th Street and case agents observed a black male occupying the driver's seat. CS-1 was followed by case agents from

18

predetermined location to the area of the 4900 block of North 40th Street and park CS-1's vehicle on the East side of the road. CS-1 was observed walking to the Maserati and engaging with the driver of the vehicle through the open driver's window. CS-1 conducted the drug transaction and was then observed walking back to the CS vehicle and departing the area. CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.

39. Following the controlled purchase case agents again met with CS-1 at a predetermined location. Once at the predetermined location CS-1 handed over approximately one half gram of suspected fentanyl and one half gram of suspected crack cocaine to case agents. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results. CS-1 stated they had observed two plastic Ziploc bags in WILLIAMS lap, one containing what appeared to CS-1 to be "a large amount of purple fentanyl" and the other contained what appeared to contain "an ounce of cocaine." CS-1 stated that WILLIAMS had retrieved small amounts from each bag and weighted them on a small digital scale located on the arm rest of the Maserati and then handed CS-1 loose amounts of each product, without a container. CS-1 also observed a large stack of US Currency located near the gear shifter of the Maserati that CS-1 estimate to be six inches thick.

### f. January 23, 2024, Controlled Buy – Rico SMITH

40. On January 23, 2024, under the direction of case agents, CS-1 conducted another controlled purchase of crack cocaine in exchange $130 USC. Case agents met CS-1 at a predetermined location and CS-1 called telephone 414-627-2727, and CS-1 was directed by a male voice to come to the area of 3rd Street and West Scott in Milwaukee, Wisconsin. CS-1 was followed from the predetermined location to the area of 3rd and Scott where surveillance had

19

already been established.  CS-1 was observed parking near the intersection of South 3rd Street and West Scott.  Just a few moments later case agents observed a black Acura SUV, Wisconsin plate AMZ-2064 (Acura) arrive and park on the opposite side of the street as CS-1's vehicle.  CS-1 was observed exiting CS-1's vehicle and walking to the Acura and engaging with the driver of the Acura through the open driver's window.  CS-1 and the driver conducted the drug transaction at this point.  CS-1 ultimately walked back to CS-1's vehicle and departed the area.  Surveillance was terminated shortly after this transaction and the Acura was not followed away from the area.

41.     Following the controlled purchase case agents again met with CS-1 at a predetermined location.  Once at the predetermined location CS-1 handed over a small plastic baggie containing suspected crack cocaine.  The suspected crack cocaine was later subjected to field tests where it yielded positive results.  The suspected cocaine was approximately 2.2 grams.

42.     CS-1 later stated to case agents that the individual driving the black Acura was the individual CS-1 knew as "Fast."  Case agents later positively identified "Fast" as Rico L. SMITH by comparting surveillance photographs to SMITH's Wisconsin Driver's license photograph.  CS-1 was also shown a Wisconsin Driver's License photograph of SMITH with no name or identifies visible, and CS-1 positively identified the photograph as the individual CS-1 knew to be "Fast."  Additionally, the Acura, driven by SMITH, is registered to Kimberly NEAL, with an address of 623 West Clarke Street, Milwaukee, Wisconsin.  Based on my training and experience, I know that it's common for drug traffickers to use vehicles not registered to themselves to avoid identification.  Through previous law enforcement contacts and reports reviewed, case agents believe that NEAL is SMITH's girlfriend.

**g.     May 9, 2024, Controlled Buy - Duane WILLIAMS**

43.     In May 2024, case agents developed a confidential source (CS-2) who stated they could purchase fentanyl from a subject CS-2 knew as "BJ."  CS-2 provided telephone number (262) 412-5521 as the number that CS-2 uses to contact "BJ."  Case agents were already aware through law enforcement database checks that the owner or holder of telephone number (262) 412-5521 was Duane WILLIAMS, who resides at 4936 North 40th Street, Milwaukee, Wisconsin.  Case agents provided a photograph of WILLIAMS to CS-2, who identified the person in the photograph as "BJ."  CS-2 stated that "BJ" lived near 40th and Hampton in Milwaukee and further said that "BJ" lived in a house that had a long wheelchair ramp.  Case agents are aware that WILLIAMS's residence is approximately two blocks north of Hampton Avenue, directly on North 40th Street, and has a long wheelchair ramp that extends from the front door down to the sidewalk. CS-2 stated that "BJ" typically charges $80 per gram of fentanyl.

44.     CS-2's information is credible and reliable because CS-2 has given information concerning individuals involved in illegal activities.  CS-2's information has been independently verified through this investigation, including through controlled drug buys, queries of law enforcement databases, and surveillance.  CS-2 has made statements against his/her penal interests. CS-2 has one felony conviction for flee/elude traffic officer.   CS-2 has no arrests or convictions relating to dishonesty.  CS-2 is cooperating with law enforcement for judicial consideration.

45.     On May 9, 2024, under the direction of case agents, CS-2 arranged to purchase $600 worth of fentanyl from WILLIAMS by communicating with WILLIAMS who was using telephone number (262) 412-5521.  During the call, WILLIAMS told CS-2 that he was on 40th Street.  Case agents and CS-2 already knew that WILLIAMS resided at 4936 North 40th Street, Milwaukee, Wisconsin.  At this time, case agents dispatched surveillance units to the area of 4936 North 40th Street.  Case agents then followed CS-2 from the predetermined meeting location to

the vicinity of 4936 North 40th Street, Milwaukee, Wisconsin. Once CS-2 arrived in that area, CS-2 placed another call to telephone number (262) 412-5521 and was instructed by WILLIAMS to go inside the residence and retrieve the fentanyl from a green boot. WILLIAMS further instructed CS-2 to leave the money inside the boot. Case agents observed CS-2 exit the CS-2 vehicle and enter the front door of 4936 North 40th Street, Milwaukee, Wisconsin where CS-2 was out of the case agents' view for a few moments. Case agents later learned from CS-2 that once inside CS-2 retrieved fentanyl from a boot and left $600, before exiting the front door. Case agents observed CS-2 return to the CS-2 vehicle and depart the area. Case agents directly followed CS-2 from WILLIAMS's residence to a predetermined meeting location.

46.     Once at the meeting location, case agents recovered from CS-2 a plastic sandwich bag that contained a greyish/purple substance suspected to be fentanyl. The suspected fentanyl had a weight of 6.4 grams and was later subjected to a field test where it yielded positive results for the presence of fentanyl. Case agents later reviewed the audio/video captured by CS-2 during the controlled buy and found it to corroborate CS-2's version of events.

**h.     June 3, 2024, Controlled Buy - Duane WILLIAMS**

47.     On June 3, 2024, under the direction of case agents, CS-2 arranged to purchase $400 worth of fentanyl from WILLIAMS by communicating with WILLIAMS who was using the telephone number (262) 412-5521. During the call, WILLIAMS directed CS-2 to come to the area of 86th and Silver Spring in Milwaukee, Wisconsin.

48.     Case agents followed CS-2 from the predetermined location to the area of N 91st Street and Silver Spring at which time case agents monitoring CS-2's active audio/video devices overheard CS-2 receive a call from WILLIAMS, who directed CS-2 to come to the alley between North 90th and North 91st Street to the north of West Thurston Avenue. Case agents maintained

22

visual contact with CS-2 as CS-2 turned north on North 91st Street, east on West Thurston Avenue, and then made an immediate left turn into the alley between North 90th and North 91st Street. As CS-2 pulled into the alley, case agents observed a gray SUV parked in the middle of the alley. Case agents observed a heavyset black male standing next to the passenger side of the SUV engaging with the driver through the open passenger window. Case agents observed CS-2 pulling up to the SUV's driver's side window and engage with the driver of the gray SUV through both vehicles' open driver's side windows. As CS-2 pulled up to the window of the SUV the unknown black male that was standing next to the passenger side was observed walking away from the SUV and entering the apartment building 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin, using the lower-level northeast corner door of the building.

49.    Case agents observed CS-2 hand a white plastic bag to the SUV's driver and then moments later observed the SUV's driver throw a white plastic bag into CS-2's vehicle through its open driver's side window. Case agents then observed CS-2 depart the area of the buy and drive to a nearby parking lot as directed by case agents. Case agents directly followed CS-2 from the area of the buy to the meeting location. At no time was CS-2 out of the case agents' sight.

50.    Once at the meeting location, CS-2 provided case agents with a white plastic grocery bag that contained a white rock-like substance suspected to be fentanyl. CS-2 stated that some of the suspected fentanyl had fallen out of the bag when thrown into CS-2's vehicle during the controlled buy. Case agents thoroughly search CS-2 and the CS-2 vehicle and recovered several small pieces of suspected fentanyl from the passenger seat and floorboard area of the CS-2 vehicle. CS-2 positively identified the driver of the gray SUV as "BJ" (WILLIAMS). CS-2 said "BJ" provided CS-2 the suspected fentanyl in exchange for $400 in OAF. The suspected fentanyl was left in the plastic grocery bag and had a total gross weight of 13.1 grams. The suspected

fentanyl was later subjected to a field test where it yielded positive results for the presence of fentanyl.

51.     As the gray SUV exited the area of the controlled purchase, case agents were able to identify the vehicle as a Maserati SUV bearing Wisconsin plate AVP-9573 (SUV). According to the Wisconsin Department of Transportation, this plate lists to a 2018 gray Maserati Levante and is registered to Dantavia Vernard Rule with an address of 161 West Wisconsin Avenue, #225, Milwaukee, Wisconsin. The SUV was not surveilled as it departed the area due to its erratic driving behavior.

52.     In preparation for this controlled purchase, case agents had also dispatched surveillance units to the area of WILLIAMS's residence, located at 4936 North 40th Street, Milwaukee, Wisconsin. Approximately 10 minutes after WILLIAMS left the alley where the controlled purchase took place, surveillance units observed the SUV arrive and park in the driveway of WILLIAMS's residence. Surveillance units were able to determine the plate on the vehicle to be AVP-9573 and also observed a black male exit the SUV and enter 4936 North 40th Street. Minutes after the black male entered the residence, the same black male exited the front door at which time DEA Special Agent Julia Gray obtained photographs of this black male. Case agents later viewed these photographs and positively identified the black male depicted in the photographs as Duane WILLIAMS.

    **i.**    **August 15, 2024, Controlled Buy - Duane WILLIAMS**

53.     On August 15, 2024, under the direction of case agents, CS-2 arranged to purchase $240 worth of fentanyl from WILLIAMS. CS-2 provided telephone number 414-308-2767 as a number CS-2 had recently received from WILLIAMS as WILLIAMS new telephone number. CS-2 made telephone contact with WILLIAMS who was utilizing telephone number 414-308-2767.

24

During the call, WILLIAMS directed CS-2 to come to the area of 91st and Silver Spring in Milwaukee, Wisconsin.

54.     Case agents followed CS-2 from the predetermined location to the area of North 91st and Silver Springs in Milwaukee, Wisconsin. CS-2 was observed turning north on North 91st from Silver Spring and then east on West Thurston Avenue. CS-2 then made an immediate north bound turn into the alley between North 91st and North 90th Street where the CS was observed parking in the alley. Just moments before CS-2 was observed entering the alley case agents observed a silver Honda Accord, Wisconsin Plate AXX-8065 (silver Honda) pull into the alley and park on the parking slab approximately three structures north of Thurston on the west side of the alley. Wisconsin plate AXX-8065 is registered to Jaia DOUGLAS with a registered address of 4605 North 48th Street, Milwaukee, Wisconsin. DOUGLAS is the known girlfriend of Duane WILLIAMS.

55.     As CS-2 was observed parking case agents observed a subject that was later positively identified as WILLIAMS exit the silver Honda and engage with CS-2 through CS-2's open driver's side window. Case agents monitoring the audio/video device CS-2 was equipped with overheard WILLIAMS tell CS-2, "let me go get it together." WILLIAMS was then observed walking from CS-2's vehicle to 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin. After several minutes case agents observed CS-2 exit CS-2's vehicle and walk to the same lower-level northeast corner door of 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin, where CS-2 could be observed interacting with someone in the threshold of the lower-level northeast corner door. CS-2 remained in the doorway for just a brief moment and was then observed walking back to CS-2's vehicle and departing the area. Case agents then directly followed CS-2 away from the location back to a predetermined location. At no time was CS-2 out of view of case agents.

56.     Once at the predetermined location CS-2 handed over a small baggie containing suspected fentanyl that was purple in color.  CS-2 positively identified WILLIAMS as the subject that had provided the baggie of suspected fentanyl to CS-2 while CS-2 was in the lower-level northeast corner doorway of 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin.  CS-2 stated that when CS-2 initially arrived in the alley they saw WILLIAMS walking from the silver Honda to CS-2's vehicle.  CS-2 stated that they believed WILLIAMS had the fentanyl at this time and had handed WILLIAMS the buy money.  CS-2 stated that after WILLIAMS took the buy money that WILLIAMS said that he had to go get it (referring to the fentanyl).  CS-2 stated that they saw WILLIAMS walk into the third apartment building to the north of West Thurston Avenue, and further stated that WILLIAMS entered the door on the ground floor farther to the right when looking at the rear of the structure, identified by case agents as lower-level northeast corner door of 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin.  After several minutes CS-2 stated that they observed WILLIAMS in the lower-level northeast corner doorway of 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin waving for CS-2 to come to the doorway.  CS-2 stated that at this time they left CS-2's vehicle and went to the lower-level northeast corner doorway of 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin where WILLIAMS was currently weighing out the fentanyl on a scale inside the apartment unit.  CS-2 stated that they observed three other unidentified black males inside the northeast corner unit of the lower-level apartment unit of 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin.  CS-2 also observed additional fentanyl in plain view inside this apartment unit.  CS-2 further stated that it appeared the apartment unit was a stash house of some kind used by WILLIAMS based on the number of unknown individuals inside and the fact that drugs and scales were in plain view from the doorway.  Case agents do not believe WILLIAMS resides at the 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin.  On the morning

of August 16, 2024, case agents observed the silver Honda parked in the driveway of 4936 North 40th Street, Milwaukee, Wisconsin, consistent with WILLIAMS still residing at that location.

57.     The suspected fentanyl the CS-2 provided to case agents totaled 4.1 grams.  The suspected fentanyl was later subjected to a field test where it yielded positive results for the presence of fentanyl.

**C.      Search Warrant of 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin**

58.     On Tuesday, August 27, 2024, Milwaukee Police Department (MPD) Tactical Enforcement Unit (TEU) executed a search warrant at 5670 North 91st Street, Unit 2, Milwaukee Wisconsin. Case agents obtained a federal search warrant on August 23, 2024, signed by Eastern District of Wisconsin United States Magistrate Judge Stephen C. Dries.

59.      Members from the entry team located Karon BROWN (DOB: XX/XX/2002), Kevin DEAN (DOB: XX/XX/2005) and Brown's two-year-old son inside the apartment upon entering. BROWN who is confined to a wheelchair, was located emerging from the master bedroom and DEAN was in the living room.

60.     After the entry was made, case agents conducted the search of the apartment. Case agents recovered several large bags of suspected fentanyl in a kitchen drawer and the freezer. Along with the suspected fentanyl, case agents recovered a machinegun conversion device or "Glock Switch" (Figure 2) in the same drawer along with suspected fentanyl.



(Figure 2)

61.      Case agents recovered an AK 47 style rifle with a pistol grip from under neath Karon Brown's bed in the main bedroom. The rifle was loaded with 23 rounds of 7.62 x .39 ammunition with one cartridge in the chamber of the gun.  Additionally, case agents recovered five cellular phones from Karon Brown's bedroom.  One black iPhone, with a blue and black case, and a "Sonim" cell phone, without a case, were located on the bed. On the nightstand next to the bed, case agents located a black ANS F30 flip phone; another black ANS F30 flip phone; and  a black Schok Classic flip phone.  Case agents recovered a sixth cell phone a black iPhone,  with a blue case with white and black trim, in the living room.

62.      The suspected fentanyl recovered from 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin was conveyed to the DEA's Milwaukee Field Office by case agents. Case agents then field tested the suspected fentanyl and placed it into DEA evidence.  The substance tested positive for the presence of fentanyl with a total weight of 118.3 grams. Another bag containing what case agents suspect to be "purple fentanyl" weighing 848.2 grams was also filed tested. These field tests were inconclusive.  The suspected fentanyl will be transferred to the DEA crime laboratory for further chemical analysis.

63.      On September 6, 2024, case agents conducted an open search of Facebook and located Karon BOROWN's Facebook page with the username **Ronnie Trnd** https://www.facebook.com/profile.php?id=100072819650726 **(Target Account)**.  On the **Target Account**, case agents were able to see several pictures of Karon BROWN open to the public on his Facebook page.  Most notably, are photos of Karon BROWN with the same pistol grip AK - 47 style rifle recovered from 5670 North 91st Street, Unit 2, Milwaukee Wisconsin (Figure 3). The rifle can be seen lying across BROWN'S lap while he is holding a Glock pistol in his right hand (Figures 3 and 4), which appeared to have been posted to Facebook on May 12, 2023.  Based on my training and experience, it appears the Glock pistol is equipped with a machine gun conversion device affixed to the rear of the slide (Figure 4). This device is similar to the "Glock Switch" or machine gun conversion device recovered from 5670 North 91st Street, Unit 2, Milwaukee Wisconsin.





(Figure 3)                              (Figure 4)

64.     Case agents also located a photo on the **Target Account** of Karon BROWN in which he appears to be holding six cellphones (Figure 5).   Based on my training and experience, those that engaged in drug trafficking will often use more than one cellphone.  Additionally, as previously noted, six cellphones were located at 5670 North 91st Street, Unit 2, Milwaukee, Wisconsin along with suspected fentanyl.



(Figure 5)

65.     Case agents believe the Facebook account associated with user "**Ronnie Trnd**", https://www.facebook.com/profile.php?id=100072819650726 (**Target Account)** continues to contain valuable information that could be used as evidence of Karon BROWN (DOB: XX/XX/2002), and other known and unknown individuals for offenses of possess with the intent to distribute, and conspiracy to possess with the intent to distribute and distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) and 846; possession of a machinegun, in violation of Title 18, United States Code, Section 922(o); and possession of a firearm in furtherance of drug trafficking, in violation of Title 18, United States Code Section 924(c).

## **FACEBOOK INFORMATION**

66.     Case agents believe the Facebook content sought and outlined in Attachment B are evidence relating to this investigation are available to Meta.

67.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.   Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

68.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.   Each Facebook user is assigned a user identification number and can choose a username.

69.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

70.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook

31

users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

71.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

72.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

73.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and retains transactional records related to voice and video chats of the date of each call. Facebook users can also post comments on the Facebook profiles of other users

32

or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

74. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

75. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

76. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

77. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

78. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

79. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

33

80. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

81. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

82. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

83. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged

34

photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

84.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

85.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including

the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## JURISDICTION

86.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## CONCLUSION

87.     Based on the foregoing, I request that the Court issue the proposed search warrant.

88.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

36

**ATTACHMENT A**

**Property to Be Searched**

**Matter No. 2023R109**

This warrant applies to information associated with Facebook account associated with username "**Ronnie Trnd** and Facebook URL https://www.facebook.com/profile.php?id=100072819650726 (**Target Account)** that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**
**Particular Things to be Seized**
**Matter No. 2023R109**

I.      **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)      All contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities from May 1, 2023, to present;

(c)      All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them from May 1, 2023, to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)      All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which

38

the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user from May 1, 2023, to present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(f)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from May1, 2023, to present;

(m)    All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(r)     Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations possess with the intent to distribute, and conspiracy to possess with the intent to distribute and distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) and 846; possession of a machinegun, in violation of Title 18, United States Code, Section 922(o); and possession of a firearm in furtherance of drug trafficking, in violation of Title 18, United States Code Section 924(c), involving Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH (XX/XX/1990); Karon BROWN (DOB: XX/XX/2002), Kevin DEAN (DOB: XX/XX/2005), and other identified and unidentified individuals since May 1, 2023, to present, including, for each user ID identified on Attachment A, information pertaining to the following matters:§

(a) The sale of illegal drugs, any preparatory steps taken in furtherance of the criminal scheme, and communications between Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB:

40

XX/XX/1987), Rico L SMITH (XX/XX/1990); Karon BROWN (DOB: XX/XX/2002), Kevin DEAN (DOB: XX/XX/2005), and others related to the relevant offense conduct of the sale of illegal drugs, possession of firearms in furtherance of drug trafficking, or the possession of a machinegun.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; and

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).